UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

SENSORMATIC ELECTRONICS
CORPORATION,

     Plaintiff,                          99cv756

v.                                  **Electronically Filed**

FIRST NATIONAL BANK OF
PENNSYLVANIA, WINNER & BAGNARA, INC.,
JAMES E. WINNER, JR.,

     Defendants.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
REGARDING PLAINTIFF'S MOTION TO CLARIFY
THIS COURT'S ORDER DATED JUNE 29, 2004**

**I.  FINDINGS OF FACT**

**A.  BACKGROUND**

1.     In 1978, Sensormatic Electronics Corporation ("Sensormatic") and Winner &

Bagnara, Inc. ("W&B") entered into a Restated Franchise Agreement ("RFA") specifying the

parties' rights and obligations with respect to W&B's Sensormatic franchise for the states of

Pennsylvania and Delaware.  The agreement provided to W&B certain sales and servicing rights

regarding Sensormatic's automatic theft detection products.

2.     At the same time, the parties entered into a lease agreement authorizing

Sensormatic to operate the franchise for a period of twenty (20) years.

3.     After holding that W&B owned the franchise at the conclusion of the lease term,

this Court entered an Interim Order on June 7, 2004, requiring Sensormatic to (a) "[provide] all

assistance and cooperation to [W&B] which is reasonably necessary for it to act in accordance

with the RFA as the franchisee for Sensormatic products covered by the RFA, in Pennsylvania

and Delaware;" and (b) refrain "from leasing, selling, distributing, servicing, repairing and maintaining such Sensormatic products, or competing with [W&B] in doing so, unless permitted to do so under the RFA." The Interim Order provided W&B a period of four (4) months from the date of a final decision to staff and supply the Franchise before assuming responsibility for the franchise operations. It required both parties to "reasonably cooperate" during this transition period. The Court subsequently entered a Judgment on June 29, 2004.

4.      The four-month transition period started on October 11, 2005, upon the United States Court of Appeals for the Third Circuit's issuance of a certified copy of its judgment affirming this Court's decision. As a result of a two-month extension granted to the parties by this Court on January 18, 2006, the transition period is scheduled to expire on April 11, 2006.

5.      Sensormatic is complying with the judgment. In October 2005, it paid W&B more than $41 million in damages. This payment was in full satisfaction for all past damages. For each month during the transition period, Sensormatic has paid an additional monthly amount of nearly $500,000.

6.      In addition, Sensormatic has assisted W&B during the transition period. Sensormatic representatives met with James E. Winner, Jr., the President of W&B, in Pittsburgh, Pennsylvania on November 2, 2005, to discuss the parties' rights and responsibilities under the RFA and to exchange information necessary for a successful transition. During this meeting, Sensormatic gave Winner access to customer lists, a list describing the items in Sensormatic's standard service/install kit, the tool and van requirements necessary for field service, and many other details. In addition, Sensormatic explained the process by which Sensormatic derived W&B's quota, the formulas used to calculate particular commissions to which W&B will be

entitled, the order process, the process by which a new customer becomes approved, and Sensormatic's standard service metrics.

7. Sensormatic's cooperation has continued since the meeting. As a result of W&B's decision in 1978 to lease its franchise to Sensormatic, more than two decades have passed since W&B last sold or serviced Sensormatic products. To assist W&B in building a sales and service organization, Sensormatic has offered to train W&B's salespeople, offered to supply at cost equipment for the service vans, shared its written profile of the qualities it looks for in a service technician, and sent its employees' names and addresses to W&B. Without interference from Sensormatic, W&B has offered employment to a long-time Sensormatic employee to develop W&B's service and installation team. After receiving notice that the employee had accepted the offer, Sensormatic met with him and offered Sensormatic's assistance in interviewing prospective W&B employees, training new employees, preparing a list of tool sets, and recommending a service van with accessories.

8. Notwithstanding their mutual efforts during the transition period, the parties have been unable to resolve five (5) issues. As a result, Sensormatic filed a motion to clarify (doc. no. 334) concerning those issues. The first three issues concern service of national accounts, including installation, maintenance, and repair ("national accounts service"), the fourth issue concerns W&B's use of Sensormatic's trademark, and the fifth issue concerns Sensormatic's obligation to produce its employees' confidential salary and bonus information.

## B.  SPECIFIC RFA PROVISIONS

9.     As this Court has previously ruled, the RFA in Section 2 grants W&B an

"exclusive" Franchise:

> 2.  Grant of Franchise.  The Franchisor hereby grants to the
> Franchisee, and the Franchisee hereby accepts, for the term of this
> Agreement, and subject to the other terms and conditions herein
> contained, an *exclusive* franchise to lease, sell and/or otherwise
> distribute, and service, repair and maintain, in the Franchisee's
> Territory, Detection Devices, Tags, Accessories and Supplies for
> Automatic Theft Detection Uses and to use the Trademarks in
> connection therewith.

(emphasis added.)

10.     Section 4 of the RFA speaks to Sensormatic's and W&B's primary areas of

responsibility as follows:

> 4.     Summary of Primary Areas of Responsibility.
>
> A.  The Franchisor's primary area of responsibility under this
> Agreement shall be the *development, design, manufacture,*
> *procurement, assembly and/or supply* of Equipment for Automatic
> Theft Detection Uses, the *furnishing* of technical information and
> know-how relating to such Equipment for such Uses, the
> *establishment* of marketing policies, and the *billing and collection*
> of accounts.
>
> B.  The Franchisee's primary area of responsibility under this
> Agreement shall be the marketing of Equipment to retail stores and
> other customers for Automatic Theft Detection Uses and *the*
> *maintenance, repair and servicing of such Equipment, within the*
> *Franchisee's Territory.*

(emphasis added.)

11.     In Section 9(c), Sensormatic has covenanted not to compete with W&B in the

Franchise Territory:

-4-

(c) <u>Exclusive Rights of the Franchisee</u>.  *Except as otherwise provided in this Agreement* or as otherwise agreed to in writing between the parties hereto, *the Franchisor shall not during the term of this Agreement compete with the Franchisee in selling or leasing Equipment in the Franchisee's Territory, and the Franchisor shall not grant to any third party a franchise or other right to sell, lease or service Equipment in the Franchisee's Territory.*

(emphasis added.)

12.     Section 5(g) addresses W&B's certain obligations and rights relating to service and installation within the Franchise Territory:

(g) <u>Service and Maintenance</u>.  The Franchisee shall establish and maintain a service organization adequate and qualified to install, service, repair and maintain the Equipment at the same level of competence and performance as is generally maintained by the Franchisor's service and maintenance personnel and facilities.  *The Franchisee shall furnish all customers within the Franchisee's Territory with all installation, service, repair, maintenance, and removal services with respect to Equipment*, including all labor and materials (except for Equipment, including replacement parts), without further cost to the Franchisor than the commission specified in Section 7 hereof, and the cost to the customer to be limited to the costs and prices specified in accordance with Section 8 hereof. . . .

(emphasis added.)

13.     Section 10 of the RFA speaks to Sensormatic's rights within the Franchise Territory as to "national accounts" - - customers who may lease or purchase Sensormatic products for use both within and outside of the Franchise Territory:

10. <u>Marketing to National Accounts</u>.  *Notwithstanding anything to the contrary contained in this Agreement*, the Franchisor shall have the right to lease, sell or otherwise distribute Equipment to national accounts for use either within or without the Franchisee's Territory, and *to contract for service, repair and maintenance in connection therewith*, provided that in the event of any such leases or sales to or contracts with national accounts of or with respect to Equipment for use in the Franchisee's Territory, the Franchisee

shall be entitled to commissions as set forth in Section 7 hereof.
For purposes of this Agreement, a "national account" shall mean
any customer, or potential customer, or any person or entity who or
which controls, or is controlled by, or is under common control
with, such customer, of the Franchisor or Franchisee who or which
has leased or purchased or may lease or purchase products for use
in more than one state or territory.

(emphasis added.)

14.    The RFA addresses Sensormatic's performance of service operations in the

Franchise Territory as follows in Section 5(g):

(g)  Service and Maintenance. . . .  Notwithstanding the provisions
of the foregoing sentence, the Franchisee shall not be responsible
for the repair of any sealed portion of the Detection Devices or
other Equipment, the repair of which shall be the responsibility of
the Franchisor and, with respect to Equipment purchased by
customers, such service, repair and maintenance services need be
provided only to the extent required under the appropriate service
or maintenance agreement with such customer or otherwise under
established service, repair and maintenance policies of the
Franchisor with respect to the Equipment.  If the Franchisee
request the Franchisor in writing to furnish expert consultation or
field engineering or "troubleshooting" services to help solve any
extraordinary installation, service, repair or maintenance problem
for any Equipment, the Franchisee shall share the costs and
expenses thereof, including travel, lodging, salary and other costs
and expenses thereof, equally with the Franchisor such account to
be balanced and paid at the end of each month.  If resident
factory-trained personnel are assigned to Franchisee's Territory by
mutual agreement between Franchisor and Franchisee, the
Franchisee shall pay such portion of the salary and expenses
thereof as such agreement shall provide, such account to be
balanced and paid at the end of each month.

15.    The RFA provides in Section 2 that W&B may "use the Trademarks in connection

. . . with" its leasing, selling, otherwise distributing, servicing, repairing and maintaining

Sensormatic products.  "Trademarks" is a defined term in the RFA in Section 1(f) as follows:

(f)  "Trademarks" shall mean any and all copyrights, trade names,

-6-

> trademarks and service marks *(including without limitation "Sensormatic")* currently or hereafter during the term of this Agreement owned or controlled by the Franchisor and relating to Equipment or the business of leasing, selling, servicing, repairing and maintaining Equipment.

(emphasis added.)  The RFA gives Sensormatic the right to prior approval of "[a]ll brochures, letterheads, advertisements and other promotional material using the Trademarks or otherwise relating to the Equipment, and any other uses of the Trademarks."  RFA at § 5(o).

## C. SENSORMATIC HAS THE RIGHT TO PERFORM THE NATIONAL ACCOUNT SERVICE

16. The first dispute is whether Sensormatic can perform national accounts service in W&B's Franchise Territory.  Sensormatic answers in the affirmative; on the other hand, W&B argues that the RFA only grants Sensormatics the right "to contract for service . . ." but not the right to perform the service.  W&B further argues that Section 10 only applies to "marketing" - - "Marketing to National Accounts" - - not service or performing service.

17. The parties agreed to distinguish in the RFA between local and "national" accounts.  A "national account" is defined as a customer purchasing or leasing the automatic theft detection products for use in more than one state or territory.

18. Regarding national accounts, Section 10 of the RFA expressly provides that Sensormatic holds the right to contract for service for such customers:  "Notwithstanding anything to the contrary contained in this Agreement, the Franchisor [Sensormatic] shall have the right to lease, sell or otherwise distribute Equipment to national accounts for use either within or without the Franchisee's [W&B] Territory, and to contract for service, repair and maintenance in connection therewith, provided that in the event of any such leases or sales to or contracts with national accounts of or with respect to Equipment for use in the Franchisee's Territory, the

Franchisee shall be entitled to commissions as set forth in Section 7 hereof." (emphasis added.)

19.     The right to "contract for service" at national accounts must include the right to perform those contracts.

20.     W&B's argument that Sensormatic's right to perform service extends only to "trouble-shooting" and similar spot jobs is inconsistent with Section 10's unambigious language concerning national accounts.  In addition, Section 7 of the RFA specifies that W&B is entitled to the fee received for equipment installation only "[i]n the event that the Franchisee performs the installation," for "separate service, repair and maintenance contracts performed by the Franchisee," and for "other service, repair or maintenance performed by the Franchisee" (emphasis added.)  This language also demonstrates that the parties contemplated not only that Sensormatic would perform "trouble-shooting" service but also installation and separate service, repair, and maintenance contracts for some customers - - namely, the national accounts.  Barring Sensormatic from "performing service" for national accounts would render this "performed by the Franchisee" language without meaning.

21.     Section 5(g) of the RFA provides further supports Sensormatic's right under Section 10 to contract for itself to perform national accounts service.  Section 5(g) specifies that W&B will provide service "only to the extent required under the appropriate service or maintenance agreement with [the] customer or otherwise under established service, repair and maintenance policies of the Franchisor with respect to the Equipment."  By requiring reference to the specific terms of "the appropriate service or maintenance agreement" to determine W&B's obligation to service a particular account, this provision anticipates that some entity, other than W&B, would perform some service contracts.  As Section 10 states, those contracts are the

service contracts entered into by Sensormatic for national accounts.

22.     Therefore, under the unambigious language of the RFA, Sensormatic is entitled to perform national accounts service in the franchise territory.

### D.  W&B IS NOT ENTITLED TO A COMMISSION ON REVENUE EARNED ON NATIONAL ACCOUNTS SERVICE PERFORMED BY SENSORMATIC

23.     The second dispute is whether Sensormatic must pay W&B a commission on national accounts service performed by Sensormatic.  As stated above, Section 7 of the RFA provides for commissions only when W&B, as Franchisee, actually performs the service. Section 7 specifically provides for commissions for installation only "[i]n the event that the Franchisee performs the installation," for service contracts if "performed by the Franchisee," and for other service jobs if "performed by the Franchisee."  Therefore, under the unambigious language of the RFA, W&B is not entitled to a commission on revenue resulting from service performed by Sensormatic for national accounts.

### E.  SENSORMATIC DOES NOT HAVE THE RIGHT TO EXCLUDE W&B FROM PERFORMING NATIONAL ACCOUNTS SERVICE

24.     The third dispute is whether Sensormatic has the right to prohibit W&B from competing with Sensormatic to perform national accounts service within Pennsylvania and Delaware.  Sensormatic argues that the RFA provides Sensormatic "with the discretion to set such a policy" and that its policy of attempting to bar W&B from competing with Sensormatic for service contracts with national accounts "reflects a reasonable exercise of that discretion."

25.     Sensormatic contends that Section 5(a) of the RFA gives Sensormatic the right to set marketing policies governing the distribution of its products - - that Sensormatic may require W&B to "sell, lease and/or otherwise distribute Equipment in accordance with the marketing policies and programs established from time to time by the Franchisor in its sole discretion and at prices specified from time to time by the Franchisor in accordance with Section 8 hereof."

26.     Sensormatic then advances the argument that it may set policies "to avoid channel conflicts" with W&B, and since "service on equipment is derivative of the sale of that equipment, the power to control channel conflict for sales includes service."

27.     Sensormatic cites several additional provisions purportedly relating to Sensormatic's policy-making control over service-related matters as follows.  Section 5(c) - - W&B is required to "adhere to" Sensormatic's "instructions in effect from time to time with respect to the installation, maintenance, repair, service, operation and use of Equipment"; Section 5(g) - - W&B is required to comply with "the established service, repair and maintenance policies of the Franchisor."; and Section 15 - - service is among the activities concerning which W&B shall not compete with Sensormatic.

28.     The language of these numerous provisions may allow Sensormatic to set policies, but it does not bar W&B from competing with Sensormatic for service for national accounts. Section 4.B and other provisions permit such service activities by W&B.  Sensormatic's policy relating to its discretion is not incompatible with W&B's servicing national accounts within the Franchise Territory.

29.     Sensormatic's decision to attempt to prohibit W&B from competing for national accounts service is unreasonable and anti-competitive, and certainly is not in the interest of

-10-

Sensormatic.  Sensormatic offers no credible evidence that there would be "[s]ubstandard service within W&B's franchise territory [which] could threaten the business not only of those national accounts headquartered in the territory but also those headquartered elsewhere that have service needs in the territory," especially if Sensormatic fulfills its obligations to provide "all assistance and cooperation to [W&B] in the transition period."  Interim Order of June 7, 2004.  Such argument also is inconsistent with Franchisee's obligations under Section 5(g), which W&B presumably will fulfill.

30.     Therefore, Sensormatic's decision to bar competition by W&B for national accounts service is an unreasonable exercise of the discretion provided by the RFA and contrary to the plain language of the RFA, when read in its entirety.

## F.  SENSORMATIC MAY NOT PROHIBIT W&B FROM USING "SENSORMATIC" AS PART OF ITS D/B/A NAME

31.     The parties' fourth dispute concerns W&B's use of the Sensormatic trademark. Under the RFA, the Sensormatic name is included within the definition of "Trademarks."  W&B claims pursuant to Section 2 of the RFA that it has an absolute right to use "Sensormatic" in its d/b/a ("doing business as") name.  W&B has stated its intention to use the following d/b/a name: Winner Security SENSORMATIC Sales and Service.

32.     On the other hand, while Sensormatic has agreed to allow W&B to market itself as an "authorized franchisee of Sensormatic," Sensormatic has asked W&B not to use "Sensormatic" in W&B's d/b/a name to avoid confusion in the marketplace.  Sensormatic contends that W&B's right to use the Sensormatic name is not absolute but rather is subject to approval by Sensormatic, as the Franchisor, "in order to ensure that the proper quality level of the

services and products is being maintained and confusion is avoided."  In particular, Sensormatic contends that the parties agreed that any use "shall be specifically approved in writing by the Franchisor in advance of the use thereof."

33.     The Court rules that W&B is entitled to use the "Sensormatic" name as part of the name under which it does business.  Sensormatic has granted a franchise to W&B.  A franchisee's power to use the franchisor's marks is a central assumption of any franchise relationship.  *See, e.g., Burger King Corp. v. Macshara*, 724 F.2d 1505, 1512 (11th Cir. 1984) rev'd on other grounds, Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985); *Montmanco, Inc. v. McDonald's Corp.*, 2005 WL 1027261, at *5 (M.D. Fla. 2005); *cf.* Fl. Stat. § 686.402(9) (defining "franchise" under Agricultural Equipment Manufacturers and Dealers Act to necessarily include grant of permission to use trade name, service mark, trademark, or related characteristic).

34.     While the RFA gives Sensormatic authority to approve W&B's use of the Trademarks, including specifically the Sensormatic name, Sensormatic may not use this authority to preclude W&B's use of the Trademarks altogether or in any unreasonable manner.

35.     As W&B *must* sell and service Sensormatic products to fulfill its obligations under the RFA, it would be unreasonable to deny W&B the opportunity to use "Sensormatic" as part of its business name.

36.     Such action by Sensormatic would be particularly unreasonable in this case, where W&B has not operated the Franchise for almost 28 years and must reestablish and identify itself in the marketplace, and, since both this Court and the United States Court of Appeals for the Third Circuit have held that Sensormatic's withholding from W&B of the right to operate the

Franchise for over more than seven (7) years was improper.

37.     Further, Sensormatic has allowed Sensormatic Security Corporation ("SSC"), the authorized Sensormatic Franchisee for Virginia, Maryland, and the District of Columbia, to use "Sensormatic" as part of its corporate and trading name since at least the 1976 execution of the restated franchise agreement between those entities.  See RFA § 21 (most favorable contracts provision.)

38.     Therefore, W&B may use Sensormatic in its d/b/a name.

### G.  ANALYSIS OF THE SCOPE OF SENSORMATIC'S OBLIGATION TO PROVIDE W&B WITH SENSORMATIC EMPLOYEES' SALARY, BENEFIT, AND OTHER HUMAN RESOURCES INFORMATION

39.     The parties' final dispute involves the sharing of confidential Sensormatic employee information.  Sensormatic contends that its obligation to cooperate with W&B during the transition period does <u>not</u> require that Sensormatic turn over all of its local employees' salary, benefit, and bonus information to W&B, and it is sufficient that Sensormatic has provided W&B with a list of Sensormatic and ADT Security Services, Inc.'s[1] local employees' names and contact information.

40.     Sensormatic contends that an employee's salary and bonus constitute very personal information; that its corporate policy prohibits Sensormatic from disclosing such information; and that it should be up to each individual employee to determine whether or not to share said information.

---

[1] ADT, a Sensormatic affiliate, acts as Sensormatic's agent in performing sales and service to national accounts.

41.     Further, Sensormatic argues "in its own right [Sensormatic] has a legitimate interest in safeguarding such information from W&B [, since] pursuant to Section 10 of the RFA, Sensormatic will continue performing sales and service to the national accounts in Pennsylvania and Delaware and will employ its sales and service forces to perform these and other duties."

42.     On the other hand, W&B argues that to effectuate the transition, Sensormatic must turn over "salaries, bonus, benefits, etc." of all salespeople and customer engineers in the Franchise Territory.  W&B also argues that it is entitled to receive Sensormatic information about the compensation of persons who are and have been involved in Sensormatic's operation of the Franchise.  Further, W&B contends that the failure of Sensormatics to provide such information constitutes a failure of Sensormatic to comply with this Court's Order to reasonably cooperate with W&B in the transition to W&B of operation of the Franchise.

43.     W&B argues also that its request for this information is reasonable, because of W&B's impending obligation to operate the Franchise, and because W&B has been prevented from long ago acquiring or developing this information on its own by Sensormatic's unlawfully withholding W&B's right to operate the Franchise for more than seven years.  W&B contends that "[t]he reasonableness of W&B's request is in no way diminished by the possibility that some of the persons now operating the Franchise will not work for W&B once the transition is complete.  The information about the compensation structure of the business that W&B has been entitled since 1998 to operate will be useful to W&B going forward."  W&B points out that, as Sensormatic has asserted to this Court that its operations within the Franchise Territory are separate from those of other Tyco affiliates that provide similar products and services, disclosure of this information arguably will cause no hardship to Sensormatic.

-14-

44.     Since the resolution of this fifth dispute required a more detailed analysis, including review of specific employee records and the sharing of possible confidential information, the parties are directed, at joint expense, to employ a well-regarded employment law attorney (with whatever supporting staff is necessary) on or before March 31, 2006, to review promptly the disputed information and then to direct Sensormatic to provide all such information to W&B "reasonably necessary" to provide "all assistance and cooperation to [W&B] which is reasonably necessary for it to act in accordance with RFA as the Franchisee for Sensormatic's products covered by the RFA in Pennsylvania and Delaware," subject to an appropriate confidentiality agreement.  This task should be completed as soon as practicable.  The parties shall submit to the Court by March 31, 2006 a proposed, consented-to Order, implementing this procedure.  If this process requires an extension of the transition period, the cost thereof shall be borne by Sensormatic.

## II. <u>CONCLUSIONS OF LAW</u>

1.     This Court has jurisdiction to hear and decide Sensormatic's motion.  *See* Doc. No. 318 (Order) at ¶ 9 (retaining jurisdiction to enforce the injunction).  "It is well established that a court that has entered an injunction has continuing jurisdiction over the case to oversee implementation of the injunction."  *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932); *see also United States  v. Local 560 (I.B.T.)*, 974 F.2d 315, 330 (3d Cir. 1992)

2.     By agreement of the parties, Florida law controls the interpretation of the franchise agreement.

3.      The provisions from the RFA relevant to resolving the disputes currently before this Court are unambiguous; and the plain language of this unambiguous contract must be enforced.  *See Green v. Life & Health of Am.*, 704 So. 2d 1386, 1391 (Fla. 1998) (Courts applying Florida law "have long held that under contract law principles, contract language that is unambiguous on its face must be given its plain meaning.").

4.      Sensormatic has the right to perform national accounts service on products sold, leased or otherwise distributed to national accounts for use in Pennsylvania and Delaware.

5.      W&B is not entitled to a commission on revenue earned on national accounts service performed by Sensormatic.

6.      Sensormatic is not entitled to exclude W&B from performing national accounts service on products sold, leased or otherwise distributed to national accounts for use in Pennsylvania and Delaware.

7.      W&B may use "Sensormatic" as part of its d/b/a name.

8.      As to the personnel information relating to Sensormatic's employees, the parties shall comply with the instructions set forth in Findings of Fact ¶ 44.


                              **SO ORDERED** this 28th day of March, 2006.


                               s/ Arthur J. Schwab
                              Arthur J. Schwab
                              United States District Judge


cc:     All counsel of record as listed below


-16-

Kenneth W. Taber, Esquire
Julianne M. Plumb, Esquire
John E. Davis, Esquire
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036

Jeffrey A. Hall, Esquire
Reeghan W. Raffals, Esquire
Bartlit Beck Herman Palenchar & Scott
Courthouse Place
54 West Hubbard Street
Suite 300
Chicago, IL 60610

Roy A. Powell, Esquire
Laura A. Meaden, Esquire
Dana Baiocco, Esquire
Jones Day
One Mellon Center
31st Floor
Pittsburgh, PA 15219

Kaspar J. Stoffelmayr, Esquire
Bartlit Beck Herman Palenchar & Scott
1899 Wynkoop Street
Denver, CO 80202

Kevin S. Batik, Esquire
Gordon W. Schmidt, Esquire
McGuire Woods
625 Liberty Avenue
23rd Floor, Dominion Tower
Pittsburgh, PA 15222-3142

Edward Barnidge, Esquire
George Borden, Esquire
Williams & Connolly, LLP
725 12th Street, N.W.
Washington, DC 20005

Scott D. Cessar, Esquire
Eckert, Seamans, Cherin & Mellott
600 Grant Street
44th Floor
Pittsburgh, PA 15219

Joseph A. Katarincic, Esquire
Stuart C. Gaul, Jr., Esquire
Thorp, Reed & Armstrong
301 Grant Street
One Oxford Centre, 14th Floor
Pittsburgh, PA 15222-4895

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

SENSORMATIC ELECTRONICS
CORPORATION,

      Plaintiff,                            99cv756

v.                                       **Electronically Filed**

FIRST NATIONAL BANK OF
PENNSYLVANIA, WINNER & BAGNARA, INC.,
JAMES E. WINNER, JR.,

      Defendants.

## **ORDER**

AND NOW, this 28th day of March, 2006, IT IS HEREBY ORDERED that the Motion to Clarify this Court's Interim Order, dated June 29, 2004 filed by Plaintiff Sensormatic Electronics Corporation ("Sensormatic") is GRANTED IN PART and DENIED IN PART and that this Court declares as follows:

1.      Sensormatic does have the right to perform service on products sold, leased or otherwise distributed to "national accounts," as that term is defined in the RFA, for use in Pennsylvania and Delaware.

2.      W&B is not entitled to a commission on revenue earned on national accounts service performed by Sensormatic.

3.      Sensormatic may not exclude W&B from performing national account service on products sold, leased or otherwise distributed to national accounts for use in Pennsylvania and Delaware.

4.      Sensormatic may not prohibit W&B from using "Sensormatic" as part of its d/b/a name.

5. As to the personnel information relating to Sensormatic's employees, the parties

shall comply with the instructions set forth in the Findings of Fact ¶ 44.

**SO ORDERED** this 28th day of March, 2006.

 s/ Arthur J. Schwab
Arthur J. Schwab
United States District Judge


cc:    All counsel of record as listed below

Kenneth W. Taber, Esquire
Julianne M. Plumb, Esquire
John E. Davis, Esquire
Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, NY 10036

Jeffrey A. Hall, Esquire
Reeghan W. Raffals, Esquire
Bartlit Beck Herman Palenchar & Scott
Courthouse Place
54 West Hubbard Street
Suite 300
Chicago, IL 60610

Roy A. Powell, Esquire
Laura A. Meaden, Esquire
Dana Baiocco, Esquire
Jones Day
One Mellon Center
31st Floor
Pittsburgh, PA 15219

Kaspar J. Stoffelmayr, Esquire
Bartlit Beck Herman Palenchar & Scott
1899 Wynkoop Street
Denver, CO 80202

Kevin S. Batik, Esquire
Gordon W. Schmidt, Esquire
McGuire Woods
625 Liberty Avenue
23rd Floor, Dominion Tower
Pittsburgh, PA 15222-3142

Edward Barnidge, Esquire
George Borden, Esquire
Williams & Connolly, LLP
725 12th Street, N.W.
Washington, DC 20005

Scott D. Cessar, Esquire
Eckert, Seamans, Cherin & Mellott
600 Grant Street
44th Floor
Pittsburgh, PA 15219

Joseph A. Katarincic, Esquire
Stuart C. Gaul, Jr., Esquire
Thorp, Reed & Armstrong
301 Grant Street
One Oxford Centre, 14th Floor
Pittsburgh, PA 15222-4895